FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 07, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CANDACE B.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 4:26-cv-5048-EFS<br><br>**ORDER AFFIRMING THE ALJ'S DENIAL OF BENEFITS** |

Plaintiff Candace B. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 2 benefits. The ALJ denied her claim at step two of the five-step sequential evaluation for determining

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

disability because, according to the ALJ, Plaintiff's medically determinable impairments of erythromelalgia and Raynaud's syndrome were not severe before her date last insured. Because substantial evidence supports the ALJ's determination, the ALJ's decision is affirmed.

## I. Background

The denial of Plaintiff's claim for Title 2 benefits comes before this Court on appeal for the third time.

Plaintiff filed her Titles 2 and 16 applications for benefits on February 26, 2019, alleging disability beginning October 1, 2013, due to erythromelalgia and Raynaud's syndrome.[2] Her Title 16 claim was

---

[2] Administrative Record (AR) 193, 196, 212, 244. Erythromelalgia is a chronic condition that causes episodes of pain, redness, and burning sensations in the hands, feet, and other areas. Erythromelalgia, https://my.clevelandclinic.org/health/diseases/22752-erythromelalgia (last visited Oct. 6, 2026). Raynaud's syndrome restricts blood flow to the fingers and toes, causing changes in skin color and temperature, and pins and needles sensations. Raynaud's Syndrome,

approved as of the filing date of February 26, 2019.[3] Her Title 2 claim, however, was denied because the adjudicator found Plaintiff was not disabled at any point before her date last insured of December 31, 2016.[4] Subsequently, an ALJ held a hearing at which Plaintiff testified that she had to stop working as an office manager in 2013 because she felt burning sensations in her feet and fingers throughout the day, which greatly limited her abilities to stand, walk, use her hands, type, and pay attention at work.[5] She said her symptoms also prevented her from sleeping comfortably, which in turn exacerbated her back pain.[6] She explained there were no medical treatment records from around this time because she did not have health insurance until 2015.[7] She

---

https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon (last visited Oct. 6, 2026).

[3] AR 91–100.

[4] AR 80–89.

[5] AR 40–58.

[6] AR 49–50.

[7] AR 50.

testified that she was diagnosed with Raynaud's syndrome in 2016 but was not diagnosed with erythromelalgia until 2018 because of the rarity of the disease.[8] She reiterated that she had been suffering from erythromelalgia since 2013 and testified that she had not worn shoes because of her symptoms since 2012.[9]

The ALJ denied Plaintiff's Title 2 claim because, at step two of the five-step sequential evaluation for determining whether a claimant is disabled,[10] the ALJ found Plaintiff did not have a medically determinable severe impairment or combination of impairments before her date last insured.[11] In March 2023, this Court reversed the ALJ's denial of Title 2 benefits and remanded for further proceedings.[12]

---

[8] AR 51–52.

[9] AR 53.

[10] *See* 20 C.F.R. § 404.1520(a)–(g).

[11] AR 17–31.

[12] AR 635–60. E.D. Wash. case no. 4:21-cv-5145-EFS.

On remand, the ALJ held another hearing, at which a medical expert, Lauren Frey, MD, testified.[13] Dr. Frey testified that no medical records established the existence of erythromelalgia before the date last insured.[14] Plaintiff's attorney presented Dr. Frey with observations from Plaintiff's former employer that before Plaintiff stopped working in 2013, she had swollen, burning, and numb hands and feet, which Dr. Frey testified was consistent with erythromelalgia, a condition that generally worsens over time.[15] The ALJ again denied Plaintiff's claim at step two, finding Plaintiff did not have a medically determinable severe impairment or combination of impairments before her date last insured of December 31, 2016.[16]

In January 2025, this Court again reversed the ALJ's denial of benefits and remanded for further proceedings.[17] This Court found the

---

[13] AR 599–613.

[14] AR 604–05.

[15] AR 606–07.

[16] AR 577–92.

[17] AR 1117–49. E.D. Wash. case no. 4:24-cv-5073-EFS.

ALJ's decision did not resolve the issues identified in the Court's first remand order.[18] This Court accordingly ordered the following instructions on remand:

> **a.** To assist the ALJ (as well as any reviewing court) in understanding Plaintiff's conditions, interpreting the medical evidence, and ascertaining the progression of Plaintiff's impairment(s), the ALJ shall obtain medical-expert testimony from an expert well versed in erythromelalgia.
>
> **b.** At step two, consistent with SSR 18-01p, the ALJ shall determine the first date on which Plaintiff met the statutory definition of disability. As part of this analysis, the ALJ must ascertain and expressly address whether Plaintiff's erythromelalgia and/or Raynaud's syndrome became severe by December 31, 2016. If Plaintiff had a severe medical impairment by December 31, 2016, the ALJ shall proceed with the remaining disability-assessment steps as appropriate.
>
> **c.** In determining Plaintiff's onset date, to allow for meaningful court review, the ALJ shall carefully and expressly consider the lay statements of Plaintiff's former coworker and former employer, found at AR 296 and 301, respectively. If the ALJ again rejects these statements, the ALJ should not rely on a mere absence of corroborating medical evidence in the record, and the ALJ shall articulate valid reasons for rejecting such compelling evidence.[19]

---

[18] AR 1147–48.

[19] AR 1148–49.

On second remand, a new ALJ, Jesse Shumway, held a hearing in January 2026 at which a new medical expert, James Haynes, MD, testified.[20] Dr. Haynes testified that no evidence showed Plaintiff's erythromelalgia was severe from 2013 to 2016.[21] Dr. Haynes also testified that erythromelalgia symptoms wax and wane, the condition is not typically completely asymptomatic, and Plaintiff had intermittent erythromelalgia symptoms between 2013 and 2016.[22]

The ALJ subsequently issued another decision finding Plaintiff not disabled at step two.[23] The ALJ noted the record contained "no objective medical evidence or signs of erythromelalgia or Raynaud's syndrome before the [date last insured]."[24] Nevertheless, based on the medical expert and lay witness testimony, the ALJ determined that

---

[20] AR 1065–90.

[21] AR 1079–80.

[22] AR 1073–78.

[23] AR 1042–56.

[24] AR 1050.

Plaintiff had the medically determinable impairments of erythromelalgia and Raynaud's syndrome during the relevant period.[25]

The ALJ found, however, those conditions did not "cause more than a minimal effect on the claimant's ability to perform basic work-related activities for a period of 12 months or more during the relevant period," so they were not severe at step two.[26] The ALJ highlighted the lack of objective medical findings of erythromelalgia and Raynaud's syndrome, but stressed that the lack of evidence alone was not the reason for the ALJ's decision.[27] Instead, the ALJ said he based his decision on "what the contemporaneously-recorded evidence dated during the relevant period affirmatively shows."[28]

Next, in accordance with this Court's instruction, the ALJ expressly considered the lay witness statements written by Teresa Caperon, Plaintiff's former employer, and Johanna Merritt, Plaintiff's

---

[25] AR 1050.

[26] AR 1050.

[27] AR 1050.

[28] AR 1050–51.

friend.[29] The ALJ discounted both statements.[30] The ALJ also considered the medical expert testimony of Dr. Haynes and Dr. Frey, finding their opinions persuasive and consistent with each other that Plaintiff did not have severe impairments during the relevant period.[31] To further comply with this Court's remand order, the ALJ found Plaintiff met the statutory definition of disability on June 13, 2018, based on the medical records.[32] Finally, the ALJ found Plaintiff's alleged symptoms were "not entirely consistent for the reasons explained in this decision."[33] Because Plaintiff did not have a severe

---

[29] AR 1051–52.

[30] AR 1051–52.

[31] AR 1052–53.

[32] AR 1054.

[33] AR 1049. As recommended by the Ninth Circuit in *Smartt v. Kijakazi*, the ALJ should consider replacing the phrase "not entirely consistent" with "inconsistent." 53 F.4th 489, 499 n.2 (9th Cir. 2022).

impairment or combination of impairments before the date last insured, the ALJ ended the analysis at step two.[34]

Plaintiff did not file written exceptions to the ALJ's decision with the Appeals Council, and the Appeals Council did not assume jurisdiction on its own, so the ALJ's decision became the Commissioner's final decision.[35] Plaintiff now appeals to district court.[36]

## II. Standard of Review

When considering the ALJ's findings, the court is constrained to the reasons and supporting explanation offered by the ALJ.[37] The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error"[38] and such error impacted the

---

[34] AR 1055–56.

[35] *See* 20 C.F.R. § 404.984.

[36] ECF No. 1.

[37] *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[38] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

nondisability determination.[39] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[40]

---

[39] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[40] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

## III. Analysis

Plaintiff argues substantial evidence does not support the ALJ's denial of her claim at step two based on the ALJ finding her medically determinable impairments of erythromelalgia and Raynaud's syndrome to be not severe. She asserts that the longitudinal record, the medical expert testimony, the lay witness statements, and her testimony all support that her conditions were severe to satisfy the minimal screening criteria of step two. In response, the Commissioner argues no error occurred and that the ALJ's decision is supported by substantial evidence. As is explained below, substantial evidence supports the ALJ's step-two denial and Plaintiff fails to establish consequential error.

### 1. Standards

#### *a. Severe impairment*

At step two, the ALJ determines whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits her physical or mental ability to do basic work activities.[41] "Step two is

---

[41] 20 C.F.R. § 404.1520(c).

merely a threshold determination meant to screen out weak claims."[42] "[C]laimants need only make a de minimis showing for the analysis to proceed past this step and . . . properly denying a claim at step two requires an unambiguous record showing only minimal limitations."[43] "If a claimant has submitted evidence of a severe impairment, [the court] analyze[s] an ALJ's step-two denial by asking whether the ALJ had substantial evidence to find that the medical evidence clearly established that the claimant did not have a medically severe impairment or combination of impairments."[44] "An inconclusive medical record precludes denial at this step."[45]

Step two involves a two-step process: (1) determining whether the claimant has a medically determinable impairment, and (2) if so, determining whether the impairment is severe.[46] As to the first prong,

---

[42] *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017).

[43] *Glanden v. Kijakazi*, 86 F.4th 838, 843–44 (9th Cir. 2023).

[44] *Id.* at 844 (citation modified).

[45] *Id.*

[46] *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).

"a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."[47] As to the severity prong, the evidence must establish that the impairment would significantly limit the claimant's physical or mental ability to do basic work activities.[48] The impairment must last or be expected to last for a continuous period of not less than 12 months.[49] Further, for Title 2

---

[47] *Id.* § 404.1521.

[48] *Id.* §§ 404.1520(a)(4)(ii), (c), 404.1522. *See* Soc. Sec. Rlg. (SSR) 85-28: Titles II and XVI: Medical Impairments That Are Not Severe ("[A]n impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities.").

[49] *See* 20 C.F.R. § 404.1520(a)(4)(ii) ("If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, . . . we will find that you are not disabled."); *id.* § 404.1509 (requiring the impairment to have lasted or be expected to last for a continuous period of not less than 12 months).

claims, the claimant must establish that the onset date of disability is before the date last insured.[50]

*b.* *Medical opinions*

An ALJ must consider and articulate how persuasive he found each medical opinion, including whether the medical opinion was consistent with and supported by the record.[51]

*c.* *Lay witness testimony*

"Testimony by a lay witness provides an important source of information about a claimant's impairments, and an ALJ can reject it only by giving specific reasons germane to each witness."[52] The Ninth Circuit recently explained the "germane reasons" standard as follows:

> In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. Accordingly, we have held that competent lay witness testimony cannot be disregarded without comment. To be sure, extensive analysis is not required; an ALJ need only give germane reasons for discrediting the testimony of lay witnesses. And the failure

---

[50] *Wellington v. Berryhill*, 878 F.3d 867, 872 (9th Cir. 2017).

[51] 20 C.F.R. § 404.1520c(a)–(c).

[52] *Regennitter v. Comm'r*, 166 F.3d 1294, 1298 (9th Cir. 1999).

> to provide such reasons can be harmless, but it is an error nonetheless.
>
> . . . .
>
> We emphasize that the "germane reasons" requirement is not onerous. It may be sufficient for the ALJ to state, for example, that the witness did not base his comments on personal observation, or that the claimant's daily activities contradict the witness's assessment, or that a medical opinion that conflicts with the lay testimony is more persuasive.[53]

In addition, questions of witness credibility are generally reserved to the ALJ.[54]

*d.* *Subjective complaints*

Finally, if the ALJ determines that "the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged," and there is no evidence of malingering, then "the ALJ can reject the claimant's testimony about the severity of her symptoms only by

---

[53] *Fain v. Bisignano*, No. 25-3219, --- F.4th ----, 2026 WL 2795427, at *5–6 (9th Cir. Sept. 18, 2026) (citation modified).

[54] *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

offering specific, clear, and convincing reasons for doing so."[55] "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."[56]

2. ALJ's Findings

*a. Medical records*

The ALJ first explained that no medical evidence reflected findings of, or treatment for, erythromelalgia or Raynaud's syndrome during the relevant period.[57] The ALJ stressed that his decision was not based only on the lack of medical evidence, but was instead based on what the evidence affirmatively showed, explaining:

> The claimant did visit medical providers during this period, and there is evidence dated during this period. This evidence shows that, during the relevant period, the claimant never complained to treating providers of redness

---

[55] *Ahearn v. Saul*, 988 F.3d 1111, 1116 (9th Cir. 2021) (citation modified).

[56] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation modified).

[57] AR 1050.

or burning in her feet or hands, pursued any diagnostic workup for such symptoms, engaged in any treatment for such symptoms, or displayed any objective signs of erythromelalgia or Raynaud's syndrome. I acknowledge that Raynaud's syndrome is included as an assessed diagnosis in a single visit in June 2016 when the claimant established care with a new provider ([AR 390]). However, it appears this diagnosis was only included based on a historical report, as the claimant did not report or exhibit any Raynaud's symptoms during that visit, and the provider did not include Raynaud's in her list of active problems ([AR 388–90]). Erythromelalgia is not included in any records from the relevant period, and there is no erythema or burning, either subjectively reported or objectively found on exam. During her doctor visits, the Review of Systems sections reflect only her complaints of back pain, hearing loss, ear pain, congestion, neck pain, cough, headaches, insomnia, gastrointestinal symptoms, and menopausal symptoms. At least one visit showed that she specifically denied swelling in the hands and feet ([AR 345]). I note the claimant was reportedly prescribed Tramadol during the relevant period, but this was for her reported back pain rather than any Raynaud's or erythromelalgia symptoms ([AR 391]). The medical records from the relevant period, which document the claimant's subjective reports and course of treatment, in addition to objective findings, compel the conclusion that, even if these conditions were present before the [date last insured], they were no more than minimally symptomatic and did not satisfy the definition of a severe impairment.[58]

---

[58] AR 1050–51 (footnote omitted).

*b. Lay witness testimony*

Next, the ALJ considered the lay witness statements. The ALJ noted that Teresa Caperon, Plaintiff's former employer, wrote in a statement submitted in March 2021 that Plaintiff's toes were "bright red" and "burning a lot" in 2011; "as time went on," the redness spread to Plaintiff's entire foot and her feet swelled up more often; in 2013, Plaintiff had trouble walking, sitting was uncomfortable for her, and she complained of numbness and burning in her fingers; and, also in 2013, Plaintiff shared that a doctor diagnosed her with Raynaud's syndrome, for which medication did not help and caused trouble in concentrating, remembering, and completing tasks.[59] The ALJ also noted that Ms. Caperon's statement indicated that she remained friends with Plaintiff after Plaintiff's employment ended and had ongoing contact with her at least through 2021.[60] The ALJ found reasons to question Ms. Caperon's statement:

> Her ongoing relationship raises the possibility, and indeed the likelihood, that some of her observations may have been

---

[59] AR 1051 (citing AR 301).

[60] AR 1051.

> made after the claimant's employment ended and after the [date last insured]. I acknowledge the District Court's reasoning that an employer's statement can generally be considered to reliably relate to the period of employment. The District Court noted that Ms. Caperon was an employer, and thus her statement is entitled to greater deference than that of a mere acquaintance ([AR 1140]). However, having carefully studied Ms. Caperon's statement, I find she was both an employer and an ongoing friend of the claimant. Her continued relationship for the next eight or more years following the end of the employment relationship raises the possibility that some of her reports may be from observations made after 2013 and after the [date last insured]. Ms. Caperon apparently wrote her statement in 2021 and purported to recite observations from 8 to 10 years earlier. Given this considerable lapse in time and the fact that she had remained in contact with the claimant for years after, the reliability of her recollection of specific symptoms and her attribution of specific dates to those symptoms is suspect.[61]

The ALJ also explained why he could not reconcile Ms. Caperon's statement with Plaintiff's contemporaneously recorded statements and the medical records:

> What I find far less suspect is the content of the claimant's own contemporaneously-recorded statements from the relevant period. In comparing the medical records to Ms. Caperon's statements, I first note that she met the claimant in 2006 and noticed her red toes in 2011. The only medical evidence before the relevant period referencing "Raynaud's phenomena" is in March 2008, and this diagnosis was

[61] AR 1051.

> precipitated only by a complaint of her fingers turning white and numb when cold ([AR 1442]). When warmed, her fingers would return to normal. She was prescribed Nifedipine, and she reported in April 2008 that it was "working well" ([AR 1447]). No medical records document complaints of red toes or feet, burning, or swelling. According to Ms. Caperon, the claimant informed her around 2013 that she went to the doctor and was told she had Raynaud's disease, but the medical records from that period do not support that claim. The medical records before the relevant period also do not reflect complaints or observations of difficulty walking or sitting. This is not a mere absence of evidence. The claimant did visit medical providers during and before the relevant period and did report an array of symptoms, but NOT the symptoms she now alleges in her disability claim. The evidence shows she had access to care and the opportunity to report symptoms to medical providers, and her reported symptoms did not include symptoms of Raynaud's disease or erythromelalgia. The dearth of any documentation of any kind by medical professionals of the symptoms the claimant alleges is irreconcilable with the notion that the claimant experienced significant symptoms of these conditions during the relevant period.[62]

Further, because Ms. Caperon's statement described symptoms only between 2011 and 2013, and the medical expert testified that symptoms wax and wane, the ALJ explained that he would still

---

[62] AR 1051–52.

conclude that Plaintiff's conditions were not severe even if he credited Ms. Caperon's statement.[63]

The ALJ turned next to the lay witness statement from Plaintiff's friend, Johanna Merritt.[64] The ALJ determined that Ms. Merritt's statement did not support that Plaintiff had severe impairments during the relevant period for the following reasons:

> [Ms. Merritt] stated she had known the claimant since 2008, and she "saw a decline in her health around 2011 when she would complain about burning in her feet." She stated that, when the claimant left her job, "the burning had already become quite bad and her feet and hands became red and swollen." Ms. Merritt further stated that she had seen more of a decline in her health "as the years have gone on," and her activity level "has increasingly declined to a point where she has become housebound." Like the District Court and previous ALJ, I note that Ms. Merritt's recollection in 2021 of her observations in 2013 might be somewhat distorted by time, and Ms. Merritt's relationship as a friend rather than employer is consistent with that reasoning. In Ms. Merritt's case, she reported that the claimant would complain about burning in her feet "around 2011," and the burning had become "quite bad" when she left her job. She then stated that the claimant's activity level decreased "as the years have gone on," which does not provide a distinct period and could easily be attributed to the period after the [date last insured]. This attribution becomes more likely when

---

[63] AR 1052.

[64] AR 1052.

> considering the contemporaneous medical evidence from the relevant period, as these records reflect no mention of symptoms, signs, or treatment for red and burning feet. Only the records dated well after the [date last insured] show the claimant's reported symptoms and eventual diagnosis of erythromelalgia.[65]

*c.* *Medical experts*

Next, the ALJ considered the medical expert testimony. The ALJ reported that Dr. Haynes testified that erythromelalgia symptoms can wax and wane; it is not typical for the condition to ever be completely asymptomatic; symptoms can be well controlled; Plaintiff appeared to be symptomatic before 2013 based on Ms. Caperon's and Ms. Merrit's statements; and Plaintiff's conditions were not severe during the relevant period.[66] The ALJ found Dr. Haynes' testimony persuasive and consistent with Dr. Frey's testimony, who also testified that Ms. Caperon's observations were consistent with erythromelalgia but

---

[65] AR 1052 (citing AR 296).

[66] AR 1052–53.

Plaintiff's conditions were not severe during the relevant period.[67] The ALJ explained:

> While Dr. Haynes' opinion is consistent with Dr. Frey's conclusion regarding the non-severity of the claimant's impairments during the relevant period, I do not solely rely on that specific conclusion. I acknowledge that Dr. Frey found Ms. Caperon's observations consistent with erythromelalgia symptoms. However, just as the medical evidence cannot be relied on by itself, lay witness statements also cannot be the sole reason to find an impairment severe or non-severe. Even though Dr. Frey acknowledged Ms. Caperon's observations as consistent with erythromelalgia symptoms, she did not retract her conclusion that the condition was non-severe during the relevant period. I accept that erythromelalgia is a medically determinable impairment before the [date last insured], but neither Dr. Frey nor Dr. Haynes believed it was a severe impairment during the relevant period, and they specialize in neurology and reviewed all the relevant records. I find both of their opinions persuasive for the consistency with the records reviewed and support they offered in their testimony. I also find their opinions consistent with Ms. Caperon's observations, as she did not actually address the relevant period but only the period prior. Her observations can be harmonized with the other evidence by acknowledging the claimant's erythromelalgia was symptomatic before the alleged onset date but not during the relevant period.[68]

---

[67] AR 1053.

[68] AR 1053.

*d.* *Subjective complaints*

Finally, preceding all the foregoing analysis, the ALJ stated Plaintiff's alleged symptoms were "not entirely consistent for the reasons explained in this decision."[69]

3. Analysis

Here, even considering Plaintiff's "de minimis" step-two burden, the ALJ "had substantial evidence to find that the medical evidence clearly established that [Plaintiff] did not have a medically severe impairment or combination of impairments."[70] This record was conclusive as to the ALJ's step-two findings.[71]

*a.* *Medical evidence*

First, the ALJ accurately reported the relevant medical records, none of which show complaints or findings of erythromelalgia symptoms, or severe Raynaud's syndrome symptoms, during the

---

[69] AR 1049.

[70] *See Glanden*, 86 F.4th at 844 (citation modified).

[71] *Cf. id.* ("An inconclusive medical record precludes denial at this step.").

relevant period. The earliest medical record from the relevant period is from October 2015, noting a visit for primary care at which Plaintiff did not report any symptoms related to erythromelalgia or Raynaud's syndrome.[72] Her provider noted "no swelling hands/feet" in the "Review of Systems" and did not report any findings associated with erythromelalgia or Raynaud's syndrome.[73] Plaintiff had primary care visits in January and February 2016 at which she described back pain and GERD in detail, but she did not report any symptoms associated with erythromelalgia or Raynaud's syndrome, and her provider did not report any findings associated with those conditions.[74] She visited a new primary care provider in June 2016, but only sought treatment for blood pressure and back pain, and did not report any symptoms of erythromelalgia or Raynaud's syndrome.[75] Her provider noted she had

[72] AR 345–48.

[73] AR 345–48.

[74] AR 392–401.

[75] AR 388.

no edema or varicosities in her extremities.[76] Her provider did list Raynaud's syndrome as one of Plaintiff's diagnoses, but the ALJ reasonably determined that this was based only on Plaintiff's historical report because Plaintiff did not complain of any related symptoms and her provider did not record any related observations or recommend any treatment.[77]

Additionally, evidence dated outside the relevant period, which may nevertheless be relevant to Plaintiff's condition during the relevant period, is unavailing. As to evidence from before the relevant period, the record contains notes of primary care visits from March 2007 to November 2011.[78] As the ALJ found, these records contain only two medical notes related to Raynaud's syndrome. In March 2008, her provider noted that Plaintiff complained of "[right] hand numbness and very cold. . . . [H]ere for fingers turning white and numb when cold for the past 4 months occurring daily[.] [W]hen warmed, they go back to

---

[76] AR 390.

[77] AR 390; *see* AR 388–91.

[78] AR 1440–86.

normal."[79] In April 2008, her provider noted Plaintiff's "[R]aynaud[']s improved" on medication which was "working well."[80] The ALJ correctly determined that these notes—which describe, at best, minimal impairment from Raynaud's syndrome,[81] do not describe erythromelalgia symptoms, and are from approximately five years before the alleged onset date—do not support severe impairments during the relevant period. The ALJ also reasonably determined that the pre-onset medical records showed that Plaintiff received medical care but never complained of erythromelalgia symptoms.

---

[79] AR 1442.

[80] AR 1447.

[81] *See also* AR 1073–74 (Medical expert testifying that Raynaud's syndrome is "very easily manageable by avoiding cold exposure," was not "even worth talking about when . . . talking about disabilities," presented only as fingers turning white when cold that returned to normal when warmed, and would not impact work functioning "unless you're working in a freezer.").

As to evidence from after the relevant period, in June 2018, Plaintiff's primary care provider wrote, "[Plaintiff] presents because she has been having problems with her feet turning bright red and burning off and on for several years. In some ways it feels to her like the [R]aynaud[']s phenomenon she gets in her hands."[82] In September 2018, she reported to a rheumatologist that she had bilateral feet swelling, redness, and pain since 2010.[83] In July 2019, she reported to a physical therapist that her erythromelalgia pain started eleven years prior and became so intense that she "couldn't walk any more" in 2015.[84] These complaints from years after the relevant period are insufficient to meet the severity prong of the step-two analysis. Notwithstanding the fact that erythromelalgia symptoms wax and wane, the ALJ rationally determined that Plaintiff would have contemporaneously reported such severe symptoms to her medical providers if they existed.

---

[82] AR 377.

[83] AR 314, 466.

[84] AR 455.

Plaintiff further challenges this conclusion based on the reviewing notes of Howard Platter, MD, who, on reconsideration of the initial denial of the Title 2 claim, noted Plaintiff "has had the symptoms since 2010 at least."[85] But Dr. Platter reviewed only records from 2019 and described Plaintiff's symptoms only as they existed in 2019.[86] Dr. Platter's statement, therefore, is based only on Plaintiff's allegation which, as explained, the ALJ reasonably discounted based on what the medical records from the relevant period showed.[87] Plaintiff also points to a January 2020 note from his rheumatologist, Sudeep Thapa, MD, but that note only repeats Plaintiff's allegation in 2020 that she had erythromelalgia symptoms dating back to 2010,[88]

---

[85] AR 85.

[86] *See* AR 81–85.

[87] Although the ALJ determined Dr. Platter did not make a medical opinion, the ALJ articulated his consideration of the supportability and consistency of Dr. Platter's conclusions, AR 1055, *see* 20 C.F.R. § 404.1520c, which Plaintiff does not challenge.

[88] AR 479.

which, again, the ALJ reasonably discounted with substantial evidence.[89]

Plaintiff next challenges the ALJ's decision based on SSR 18-1p, which advises that the onset date for an impairment that worsens over time may predate the earliest medical records.[90] The argument is unconvincing because SSR 18-1p addresses impairments that meet the statutory definition of disability, and the ALJ here rationally determined that there was no time before 2018 that Plaintiff established severe erythromelalgia symptoms that could be expected to significantly limit her ability to do basic work activities for a continuous period of at least twelve months.[91]

Plaintiff also contends the ALJ impermissibly held her inability to afford treatment until late 2015 (from 2013 until then she did not

---

[89] The ALJ also evaluated Dr. Thapa's medical opinion according to 20 C.F.R. § 404.1520c, AR 1055, which Plaintiff does not challenge.

[90] SSR 18-1p: Titles II and XVI: Determining the Established Onset Date (EOD) in Disability Claims.

[91] *See* 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), (c).

have medical insurance) against her, claiming the ALJ here committed the same error as the ALJ in *Glanden v. Kijakazi*.[92] It is true that although "an unexplained, or inadequately explained, failure to seek treatment . . . can cast doubt on the sincerity of a claimant's pain testimony," the ALJ cannot reject "a claimant's complaints for lack of treatment when the record establishes that the claimant could not afford it."[93] But the ALJ did not do so here. Rather, the ALJ looked at the medical records from when Plaintiff did seek treatment during the relevant period and reasonably determined that her complaints during those appointments undermined her later complaints.[94] Nor were the treatment records the ALJ's only explanation; the ALJ also relied on two medical experts who reached the same opinion of non-severity.

In *Glanden*, the claimant sought disability benefits for a time when the claimant had no medical treatment records.[95] The Ninth

---

[92] 86 F.4th 838 (9th Cir. 2023).

[93] *Regennitter*, 166 F.3d at 1297 (citation modified).

[94] *See* AR 1050–51.

[95] 86 F.4th at 844.

Circuit held that the claimant "made the requisite showing to meet step two's low bar" because:

> He submitted evidence that he suffers from multiple chronic medical conditions that both preceded and succeeded the gap in his treatment. He explained that the gap in treatment was due to his inability to pay. In addition, an agency medical expert testified that based on Glanden's records, he would expect that Glanden experienced symptoms serious enough to require treatment during the relevant period. This cumulative evidence is enough to establish that Glanden's claim is nonfrivolous and to require the ALJ to proceed to step three.[96]

The Ninth Circuit explained that the ALJ erred first because the ALJ discounted Glanden's symptoms based on his access to free medical clinics, but disregarded that those clinics could not appropriately treat his conditions.[97] Second, the ALJ ignored Glanden's explanation that, instead of treatment, he "extensively modified his activities of daily living to cope with his symptoms."[98] Third, the ALJ inadequately considered a medical expert's testimony that "he would expect Glanden

---

[96] *Id.* at 844–45.

[97] *Id.* at 845.

[98] *Id.*

to have had serious symptoms that required treatment during the relevant period."[99]

The Ninth Circuit contrasted *Glanden* with another case, *Ukolov v. Barnhart*,[100] where the Ninth Circuit affirmed the ALJ's step-two denial "because 'even the claimant's doctor was hesitant to conclude that any of the claimant's symptoms and complaints were medically legitimate.'"[101] "Indeed, the *Ukolov* claimant failed to show that he had any diagnosed impairments, and his physicians were unable to verify his alleged symptoms through any medical examinations or test results."[102] Unlike the *Ukolov* claimant, "Glanden's extensive medical history and explanation for his gap in treatment distinguish his case as

---

[99] *Id.* at 846.

[100] 420 F.3d 1002 (9th Cir. 2005).

[101] *Glanden*, 86 F.4th at 845 (quoting *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005)) (citing in turn *Ukolov*, 420 F.3d at 1006).

[102] *Id.*

one in which substantial evidence does not support the finding that the record clearly establishes the absence of severe impairments."[103]

Here, the instant case is distinguishable from *Glanden* for several reasons. Unlike in *Glanden*, there is no medical evidence of one of Plaintiff's conditions, erythromelalgia, from before the time during which Plaintiff did not have medical insurance. Instead, there is medical evidence of only one minimal presentation of Raynaud's syndrome from well before the relevant period. There is also medical evidence from the relevant period, and those medical records contradict Plaintiff's later complaints. Also, Plaintiff had medical insurance starting in late 2015 but the first medical record of erythromelalgia symptoms is from June 2018. Although erythromelalgia symptoms are typically intermittent, this nearly three-year gap favors the ALJ finding no continuous twelve-month period of severe impairments during the relevant period. Further, Plaintiff does not have medical testimony on her side; instead, two medical experts, both neurologists well-versed in erythromelalgia, testified that Plaintiff's impairments

---

[103] *Id.* at 845–46.

were not severe during the relevant period. Although Plaintiff's case is not like *Ukolov* because doctors ultimately were able to diagnose Plaintiff's conditions after the relevant period, substantial evidence still supports the ALJ's evaluation of the medical evidence here.

*b.* *Medical experts*

The testimony of medical experts Dr. Haynes and Dr. Frey contribute to the substantial evidence supporting the ALJ's step-two finding and the conclusiveness of the record. Both experts reviewed the record and opined that Plaintiff's impairments were not severe during the relevant period.[104] The ALJ reasonably determined the experts' opinions were persuasive because they were supported by their testimony, review of the record, and expertise; uncontradicted by any other medical opinion; and consistent with each other, the medical evidence, and Ms. Caperon's statement.[105]

Plaintiff contends the medical expert testimony was qualified. Plaintiff accurately recounts that Dr. Haynes testified that

---

[104] AR 604–05, 1073–74, 1079–80.

[105] AR 1053.

erythromelalgia symptoms wax and wane; the condition is not typically completely asymptomatic; the condition occurs in flares before progressing; he believed Plaintiff was symptomatic before 2013; there was "insufficient data" to determine when the condition was symptomatic; and, when the ALJ asked, "would an appropriate way to harmonize the medical evidence with the lay witness statements be to find the claimant was symptomatic before the alleged onset date, but not between the alleged onset date and the end of 2016?", Dr. Haynes responded, "I would say intermittent between those dates."[106]

But Plaintiff is not correct that this testimony creates an ambiguity in the record to overcome her minimal step-two burden. In testifying that Plaintiff may have had "intermittent" erythromelalgia symptoms during the relevant period, Dr. Haynes did not opine that such symptoms were severe. Instead, he offered this testimony only to harmonize the medical evidence with the lay witness statements, and

---

[106] AR 1073–78.

he still opined that whatever symptoms Plaintiff may have had during the relevant period would not cause work-related limitations.[107]

Plaintiff also argues the ALJ's reliance on Dr. Frey's consistent opinion was erroneous because Dr. Frey testified that Ms. Caperon's observations were consistent with erythromelalgia. Plaintiff further contends the instant ALJ, like a previous ALJ who erred, impermissibly adopted Dr. Frey's opinion based only on the lack of contemporaneous medical documentation. Both arguments fail. Dr. Frey's testimony that Ms. Caperon's observations were consistent with erythromelalgia supports impairments only before the relevant period and has no impact on Dr. Frey's opinion that Plaintiff did not have severe impairments during the relevant period. And, as discussed throughout this Order, the instant ALJ thoroughly explained with substantial evidence how his decision was not based only on the lack of contemporaneous medical evidence.

---

[107] AR 1079–80.

*c. Lay witness testimony*

Next, substantial evidence supports the ALJ's findings that Ms. Caperon's and Ms. Merritt's statements did not support severe impairments during the relevant period. The ALJ provided explanations, all supported by substantial evidence, that exceeded the "germane reasons" requirement.[108]

The ALJ accurately and thoroughly reported the content of Ms. Caperon's lay witness statement.[109] The ALJ then reasonably acknowledged that, as Plaintiff's former employer, Ms. Caperon's statement might offer a credible perspective on how Plaintiff's impairments impacted her ability to work. But the ALJ reasonably determined that Ms. Caperon was also an ongoing friend, because Ms. Caperon's statement said they were "good friends" and "remained friends" after her employment ended in 2013, Ms. Caperon was aware of a diagnosis Plaintiff received in 2018, and Ms. Caperon wrote her

---

[108] *See Fain*, 2026 WL 2795427, at *5–6.

[109] *Compare* AR 301, *with* AR 1051.

statement in 2021.[110] The ALJ also reasonably determined that Ms. Caperon's recollection might not be reliable due to the considerable lapse in time. These findings fall well within the ALJ's general duty to assess witness credibility. As they are apparent from the face of the witness statement itself, they are supported by substantial evidence.

Further, the ALJ discounted Ms. Caperon's statement based on the medical evidence, correctly stating that Plaintiff had medical visits from around the time of Ms. Caperon's reported observations of symptoms, but Plaintiff never reported such symptoms to medical providers at the time. In addition, the ALJ reasonably emphasized that Ms. Caperon's statement only described symptoms from before the alleged onset date. Although Ms. Caperon's description of symptoms "by 2013"[111] may have overlapped with, or been related to, the relevant period, substantial evidence supports the several germane reasons the ALJ provided for discounting Ms. Caperon's statement.

---

[110] *See* AR 301.

[111] AR 301.

The same is true with respect to Ms. Merritt's statement. The ALJ accurately and thoroughly reported the content of Ms. Merritt's lay witness statement.[112] The ALJ reasonably determined that Ms. Merritt's observations were not reliable because she recollected in 2021 her observations from 2013, and Ms. Merritt was only a friend. Further, the ALJ accurately pointed out that Ms. Merritt did not attribute a particular date for her post-2013 observations, such that Ms. Merritt's observations could be attributed to after Plaintiff's date last insured. The ALJ, therefore, provided several germane reasons supported by substantial evidence to discount Ms. Merritt's statement. On this record, the lay witness statements do not make the severity question inconclusive for purposes of Plaintiff's step-two burden.

*d. Subjective complaints*

Finally, substantial evidence supports the ALJ's rejection of Plaintiff's subjective complaints, which the ALJ justified with specific, clear, and convincing reasons. Notably, the ALJ introduced his entire step-two analysis with his subjective-complaints finding: "the

---

[112] *Compare* AR 296, *with* AR 1052.

claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent for the reasons explained in this decision."[113] On this record, the ALJ appropriately styled his decision in this fashion. The ALJ's entire decision was directed at why the record did not support severe impairments at step two despite Plaintiff's complaints, with the ALJ explaining that only Plaintiff's complaints and the lay witness statements supported the existence of severe erythromelalgia symptoms during the relevant period.

Further, the discussion after the ALJ's subjective-complaints finding was not erroneously a mere recitation of the record.[114] Instead, as the foregoing analysis in this Order demonstrates, the ALJ's decision was replete with reasons that were (1) clear, as the ALJ's explanations and references were thorough and unambiguous; (2) convincing, as the ALJ supported all his reasons with substantial evidence that was compelling enough even to show Plaintiff did not

---

[113] AR 1049.

[114] *Cf. Ghanim*, 763 F.3d at 1163.

meet her de minimis step-two burden; and (3) specific, as the ALJ repeatedly noted that his analysis of the medical records, medical expert testimony, and lay witness testimony was to test Plaintiff's assertion of specific erythromelalgia and Raynaud's syndrome symptoms.

Plaintiff faults the ALJ for not addressing her specific hearing testimony that she needed to lie down during the day with her feet elevated, had excessive absenteeism, and had severely restricted use of her hands. True, the ALJ did not specifically address such testimony. But the ALJ clarified throughout his decision that he examined the record for any evidence of erythromelalgia—and particularly evidence of pain, swelling, and/or redness in Plaintiff's hands and feet—which reasonably encompasses Plaintiff's testimony. And if the ALJ did err as Plaintiff claims, any error is harmless because the clear, convincing, and specific reasons the ALJ provided apply equally to the proffered excerpts of Plaintiff's hearing testimony.

## IV. Conclusion

The record is unambiguous and shows only minimal limitations before the date last insured. Plaintiff fails to establish that the ALJ

consequentially erred. The ALJ's nondisability findings are supported by explanation and substantial evidence.

Accordingly, **IT IS HEREBY ORDERED**:

1. The ALJ's nondisability decision as to Plaintiff's Title 2 application is **AFFIRMED**.
2. The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 12 and 14**, enter **JUDGMENT** in favor of the **Commissioner**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 7th day of October 2026.

EDWARD F. SHEA
Senior United States District Judge